Next piece on today's docket is the piece of Anne Rae Parentage of Peyton Rene Marshall versus Paul Marshall Jr., Jennifer Carr versus Paul Marshall Jr., and we have Elena Mejia for the appellant, and we have Stan Brandmeier for the athlete. Good afternoon, your honors. May I please report to Brandmeier? Again, my name is Elana Mejia, and I am here on behalf of the appellant, Paul Marshall. I will dispense with the recitation of facts unless it looks like otherwise. I think if it would assist you, otherwise you can dispense with the facts. We've read the briefs. It's our position that the trial court erred in granting Jennifer's petition for removal. The paramount question when a court decides whether or not to grant a petition for removal is to determine what's in the best interest of the minor child, in this case, Peyton Rene Marshall. The trial court never made that determination. They never made that finding. In order to determine whether or not a removal was in Peyton's best interest, the trial court had to consider the effort factors. The court did not consider those factors, and a proper balancing and consideration of the effort factors will reveal that the removal was not in Peyton's best interest, and allowing that removal was against the manifest weight of evidence and pulled otherwise would result in manifest injustice. As to the effort factors, the first one is whether the removal is likely to enhance the child's quality of life. In the Eckerd case, the petitioner wanted to move to Arizona to advance her career and improve her son's asthmatic condition. The court ruled, or the court denied that petition and stated that while she sought employment in Belleville, she did not- Let me ask you a question real quick if I can. The trial court in the judgment order made no specific findings as to best interest or the Eckerd factors. That's correct. But did he make any oral rulings at the time of deciding the case? No, Your Honor. Okay. So there's nothing in the record about it, but- Correct. But I want to follow that up with, did not the judge in his judgment make specific reference to incorporating the GAL's findings? No, Your Honor, did not. It did not? No. There was no mention of the GAL finding report? No. The transcript, actually, the proceedings as well as the record and the court order that was entered on July 13th is bereft of any acknowledgment or adoption by the court of the guardian ad litem report. And I know that Jennifer's brief did state that the GAL did testify and that the GAL did consider the Eckerd factors and the court then adopted it. Jennifer is correct in stating that the guardian ad litem, Tony Garavaglia, did consider the Eckerd factors, but she is incorrect in stating that the court adopted it. There is, as previously stated, there is, in the transcript as well as the order, there is no acknowledgment by the court of adopting the guardian ad litem's report. Jennifer's brief is unable to cite to the record or the transcript of proceedings to support that assertion because no such cite exists. Is there a case law that says that the court must actually state in its order that it considered the Eckerd factors? I mean, your argument basically is the court doesn't say that he considered those factors in any way, but it's still a manifest weight, and so you're arguing manifest weight is that once you consider the Eckerd factors, the opposite conclusion is apparent. Is that what your argument is? That's correct, Your Honor. In other words, okay, go ahead. That's correct, and I believe that while there may not need to be specific findings within the order, that may be the case if those findings are made on the record or during the proceeding. We have no idea why he concluded what he did because he did not consider those factors. He did not make those findings. As to the first factor to enhance the quality of the child's life, similar in Eckerd, Jennifer wanted to move to Arizona to advance her career and improve Peyton's asthmatic condition. While residing in Illinois, Jennifer had a full-time job. She had been employed there for at least a year and a half. She was making $11 an hour, and it was in a field that she was planning to pursue her career. I believe it was in nursing. It was at St. Elizabeth's Hospital. One month prior to filing her petition for removal, Jennifer voluntarily quit that employment. As to Peyton's asthma condition, there was actually no medical evidence presented as to her asthmatic condition, other than that when Peyton would go visit Arizona or stay with her grandparents, the wheezing would decrease. As evidence of that, Peyton, her condition was controllable using an inhaler. Peyton actively participated in soccer, gymnastics, and dance in Illinois, and the asthma did not seem to inhibit those activities. As to in remand to Stone, which was also cited in the brief, the court denied that petition for removal and found that all of the goals for the petitioner could be achieved within Illinois, and that is the same thing with Jennifer. Similar to in Stone, Jennifer's parents have financially assisted her. She has had that benefit while she was residing in Illinois, as was the petitioner in Stone. And just like the petitioner in Stone's father, Jennifer's mother, Melissa Carr, testified that she would continue to financially assist Jennifer if she remained in Illinois. In addition, Jennifer's goal of completing her education and pursuing a nursing degree could also be done in Illinois. Jennifer had been a student at SWCC for six years on and off. SWCC had a nursing program, which Jennifer testified that she did not even consider or look into. Jennifer also had a position with a part-time work study at SWCC. She was receiving grants and loans from SWCC, and as previously stated, she had full-time employment while she was living in Illinois. Paul's visitation, I'll come back to that. As for Jennifer's motives for requesting removal, it was our contention that it was a little bit suspect. Jennifer had been dating and residing with her boyfriend, Kelly Lumbar, for a period of almost four years. Kelly owned the home that they lived in, and he paid for the mortgage and utilities. They separated in December of 2010, January 12th, or sorry, December of 2009. January 12th of 2010, she filed for petition for removal to go to Arizona. I wanted to ask you what impact you believe in rape heritage of RMF has on some of these factors, and potentially the one you just discussed. Actually, Your Honor, I was going to get to that. I don't believe that in rape the parentage of RMF is good law anymore. Specifically, it states that Section 609 of the Illinois Marriage and Dissolution of Marriage Act does not apply to parentage cases. That's just not the case anymore. That is not good law. In July of 2003, the Parentage Act was amended to explicitly incorporate the removal provisions of Section 609 of the Illinois Marriage and Dissolution of Marriage Act. So I don't think that that case is relevant. I know that the appellee relies heavily on it within her brief, but it's just simply bad law. As to her motivation, she stated that it was to complete her education and to improve Payton's respiratory conditions. As stated with SWCC, she had attended there for six years. She had a part-time work-study position, and she was receiving grants and loans. She did not look into less expensive nursing programs, whether it be at SWCC, SAUE, Carbondale. At Yavapai Community College, at the time of trial, Jennifer hadn't even been accepted to the nursing program. She had not even taken the entrance exam. She had no employment prospects in Arizona, and she had not looked into financial aid. Again, as to the asthma, as I previously stated, Payton's asthma condition was controllable. She used an inhaler, and she actively participated in sports and activities while she was in Illinois. As to the motive of Paul in opposing this removal, his motive was pure. He just didn't want to be that far from his daughter. I know that the appellee states that Paul refused additional visitation with Payton. Well, as he testified, he had not had to, but he refused that visitation because of the distance and the cost of traveling was just too much for him. If that distance and cost, which was about an hour, hour and a half, is minimal compared to the $300,000 airplane ticket and 24-hour one-way drive from Arizona, clearly that's going to be a restriction on his visitation with Payton. The fourth and fifth factors I'll talk about together are whether the visitation, looking at the visitation rights of the noncustodial parent, in this case Paul, and whether a realistic and reasonable visitation schedule can be reached. It's obviously within Payton's best interest to have a healthy and close relationship with both of her parents as well as extended family. Paul exercised visitation twice a week prior to Payton going into school. Once Payton began school, he then had alternate weekend visitation. Again, I know that the appellee points out that Paul never sought to declare his rights as a parent. Well, there was no need to. The two of them had signed a voluntary acknowledgment of paternity. As the effort case points out, a reasonable visitation schedule is one that will preserve and foster the child's relationship with the noncustodial parent. Jennifer simply did not do that while she was residing in Illinois, and it would therefore be difficult to say that she would do that living in Arizona, almost 24 hours away. Jennifer did not provide information as to Payton's teachers, Dennis, and again, Paul did not know those names. He did not know the teachers' names, the Dennis names, her friends. And when Jennifer was asked whether or not she considered notifying Paul of these various things, her answer was it just never occurred to me. Counsel, are you asking this court to remand the case back for the trial judge to make a determination? Yes, sir. Of the best interest? Yes, Your Honor. Would that entail taking additional evidence or have the court just, based upon the testimony evidence that he's already heard, make that point? I believe that that decision can be made based on the testimony that's already been heard. I believe once the accurate factors are actually considered and balanced properly or at all, that the only reasonable conclusion is that removing the child to Arizona was not in Payton's best interest and was against the manifest weight of the evidence. So it's likely that it would come back up here again then? If it was remanded back down and the court found that it's the best interest, we'd be back up here again then, right? Or you all would be back up here? Yes, I guess so. Okay. Did you have a question? Yeah, now I have to remember what it was. That's okay, go ahead. Oh, yeah, here's one. I haven't had a chance to look at the record yet. Were there written closing arguments or were they oral closing arguments? Oral. And did you argue the accurate factors to the judge? I did. And did both sides do that, I guess, and best interests and accurate factors? I believe we did. All right, so certainly the judge heard all that before he ruled. He heard the argument about the factors and what the standards were. I believe we argued that it was not in Payton's best interest. I don't believe that I actually outlined the accurate factors. Okay. I just want to make sure there was a – in other words, it wasn't a situation where evidence ended, the judge said, okay, I'm taking it under advisement, and you got an order that didn't talk about the accurate factors. That was part of the argument all along? I believe so. Okay. Again, as to Paul's visitation, a realistic and reasonable visitation schedule cannot be reached. As stated, it's anywhere between $300 to $1,000 for a flight to Arizona or a 24-hour one-way drive. Payton also had a very good relationship with Paul's extended family. The testimony shows that Payton attended family gatherings with Paul and or his parents because that is who he lived with. And they live in Missouri. Is that correct? That's correct. And how far away from the original home in Illinois? It was approximately an hour to an hour and a half. What city is it or town? In Missouri? Yes. Owensville, I believe. So Payton did attend graduation parties, birthday parties, and family reunions with Paul and his family. And the practical effect of the court's ruling is that Paul and his family will not have any relationship with Payton. I also cited in remarriage of Deckard, and while not dispositive, the court should consider a reduction in visitation when such a reduction results in an unreasonable and unrealistic visitation schedule, which is the case in this matter. Again, it's our contention that the trial court failed to make a determination that the removal was in Payton's best interest and failed to make any findings as to the best interest or the Eckerd factors on the record on July 9th or in the final order entered on July 13th. The trial court failed to apply the Eckerd guidelines that were before him and erred in branching the removal, and the trial court's determination was against the manifest weight of the evidence and to hold otherwise would result in manifest injustice. Are there any further questions? Thank you. You'll have the opportunity for a rebuttal. Thank you. Mr. Brandmeier. Thank you, Your Honor. Peace of court. My name is Stan Brandmeier, and I represent Jennifer Carr in this case, as the court knows. This is, quite frankly, a case where the facts are important because it is the application of the facts that allows the case to arrive at the decision that it made. So an important factor in this whole case, and I won't go over too many of the things that Ms. Mejia had spoken about other than to perhaps rebut them, but an important factor is that Paul Marshall, the father of this child, actually did nothing but reduce the amount of time that he was going to effectively spend with his child while the child was living in Illinois. He voluntarily moved from Illinois, where the two had been living. He left, or rather they separated, I'll say like that. Paul and Jennifer separated roughly six months after this baby was born. He voluntarily moved to his parents' house, and he said that it was, I believe, an hour and a half drive one way for him. He thereafter moved a number of different other places. He had lived previously also in Swansea, which was closer. He moved to a law department in downtown St. Louis, which was also closer. But he continued to work in other places and continued to adhere to the argument that because it's one and a half hours away, he's not going to use the visitation that he was given. The fact of the matter is that when he was in St. Louis downtown, he still didn't use that visitation. Or when he was living in Swansea with a friend, he didn't use that visitation. He actually also admitted in his testimony that he would be okay with Jennifer leaving the state, which is actually the seminal issue in this case, if Jennifer lived an hour to an hour and a half away from him. So I asked the question, would it be okay if Jennifer moved to the state of Missouri so long as she was within an hour to an hour and a half away from him? He said yes. I said, what if she stayed in Illinois? What if she moved to Chicago and that area? He said, that's too far. So the question in his mind is not actually whether or not she has the authority to move out of the state of Illinois, the seminal issue. The question is whether or not he is going to be inconvenienced by the move. Did his answer surprise you, any of those questions? Actually. I mean, isn't that in removal situations, that's pretty much always what the issue is, isn't it? It generally is. How far away somebody is going. It's always a question of distance, more so than a specific state. However, he did also say, as Ms. Mejia was talking about, my client having a boyfriend for four years, Kelly Lombard. He did say, Mr. Marshall did say, that if my client lived with Kelly Lombard and they moved to Arizona, he would have been okay with that. That was the intriguing thing about it. So he has these strictures that he set up, and they're artificial at best because he was the one who moved. And because he was the one who moved, he doesn't want to be further inconvenienced by another move. But he would be okay if my client continued to live with her, at that time, boyfriend, and moved to Arizona. So there's a disconnect there. The facts are important. He did not know any of these important persons in little Peyton's life. He didn't know her dentist. Didn't know her dance teacher. Didn't know her daycare worker. Didn't know her friends. I guess that cuts both ways, though, if that information was kept from him. Yeah, I don't think there was any testimony that it was ever kept. The testimony more than likely could be characterized by, if Mr. Marshall was not spoon-fed information, he didn't get it. Even with regard to his ability to visit more and talk with Peyton on the phone, he always had a different reason for it. His father, since May of 2009, I believe, was the person who would pick Peyton up from her mother's house and take Peyton to their house, and only to find out that the visitation which Mr. Marshall had agreed to, he was working most of the time. Counsel, could you comment on President Counsel's one of her first points you made, and that is the statement in your brief that, most notably, the court adopted the recommendation of the GAL. She claims that that's nowhere in the record. Can you tell me where that you cite, 158-167? 158 to 167, Your Honor, at least beginning with page 158, is the direct examination by Ms. Mejia of the guardian ad litem. And in that direct examination, the guardian ad litem specifically states that he believes that the evidence has fulfilled the effort factors. Right. Announces that case by name, and then goes through each one of them. So it's kind of, it's form over substance. It suggests that a court did not consider something because it didn't put it explicitly in an order. The transcript. I mean, you make the statement the court adopted the recommendation. Right. How do we know that? Well. I mean, the court may have been daydreaming when the witness testified. Who knows? Not that that would ever happen. Not in this case, Judge. On page 177 of the transcript, without specifically referring to Eckert, the court says, I concur with Mr. Garavaglia, who was the guardian ad litem, that this is not an easy decision to make, and I'm not going to insult either of you by sitting here right now and making a decision based upon everything that's presented to me this morning. So the court was aware of the testimony. Granted, the court didn't say, you know what, I agree with the guardian ad litem as it relates to Eckert and the application of Eckert to these facts, but the court acknowledged that the guardian ad litem spoke. Maybe adopted is a little too strong of a characterization than considered, perhaps. Perhaps. Adopted to me means that he took it as gospel or became part of his judgment. Yeah, I would agree with the court that what he said, in essence, what the court said, in essence, was that he recognized that the guardian ad litem spoke of Eckert. So if we remanded it back down for specific findings, do you think the court would then officially adopt whatever this witness said, the GAO said? I think so. There wouldn't be any need for additional evidence on your behalf? I don't believe so, because that was the reason why the court appointed the guardian ad litem to begin with. As this court knows, the court will oftentimes appoint the guardian ad litem to be the eyes and ears of the court and make recommendations. Now, it might be superfluous to repeat those recommendations in an actual written court order, but definitely the court will listen to those recommendations. Many times, though, I'm assuming you've done a lot of domestic cases, many times the court goes against the GAO's report. That is correct. That is correct. So sometimes they listen to it and they don't adopt it. Yes, that is correct. I don't know the number of times in those circumstances where the court specifically states that they're not going to accept specific recommendations by the GAO. It's clear from everything that's in this record that the court adopted everything that the GAO said, from my perspective. Let me ask you one other question. In the judge's order, it talks about 60% and 40% of the travel costs. Where did those figures come from? Do you have any idea? That I don't know, other than I can assume that the recommendation was to balance some of the equities of the travel. Did you suggest it or did the opposing counsel suggest it? Did anybody suggest those numbers? Actually, this doesn't appear in the record, Your Honor, but the court pulled me aside after considering this and told me that these were the factors he wanted included in a court order, and my office prepared a court order. The proposed order that was signed by the court. So he told you to insert 60 and 40 then? Yes. Okay. Yes. And I can say as an officer of the court that he did not indicate to me that I needed to include the effort factors in the rule. But our position is that the court was fully aware of those factors, and each one of those, or rather the court order is a distillation of what it will need to be after applying those factors. Now, there was also an interesting part in the testimony by Mr. Marshall that said with his last job, he's working at a QT convenience store, that he had even looked into the possibility of transferring, because he understood that was available to him, transferring to the state of Arizona so that he could be closer to his child. That, quite frankly, was the first indication from Mr. Marshall that he actually understood that he had a responsibility to see his child without the child being given to him directly. That was a good sign. I don't think there was any suggestion that Jennifer was doing anything other than trying to facilitate their relationship, and I believe the court recognized that as well. Contrary to what Ms. Mejia had said, I don't think that Jennifer has to exhaust every possibility of trying to find work and school and everything else in this area before she moves to a different state. Mr. Marshall stated on the record that he believed because Jennifer was being supported, sometimes to the tune of $20,000, being supported by her parents, that they should continue to support her and funnel money to her while she goes to school here. I don't see how he can support that proposition. He was living with his parents, who were roughly supporting him. The testimony is replete with testimony by him that he relies on his parents very, very heavily, but he doesn't want Jennifer to move with her child to the state of Arizona so that she can reduce the burden that her parents would ordinarily have if she lived here. Something that Ms. Mejia said also was that the first part of Eckert was that we would have to show that this was, I forgot the phrase that she had used, but strictly for the benefit of the child. And Eckert finds that the basis is that if this move is in the best interest of the custodial parent and the child. Now, the testimony was that this would be. Jennifer was going to be able to go to college, and granted she may be supported by her parents while she does it. She has a place to live. Her little girl has a place to stay. She has the ability to finish this degree. And then after that, because her mother, Jennifer's mother, was a nurse, that she may be able to find employment at the place that her mother was working. The community, there was nothing unusual about the community, other than the fact that it was a nice community. It had ample opportunity for this little child to flourish. The schools were good. The parks and recreation were good. The home values were good. Everything was good. The other aspect of this case was that Peyton suffered from respiratory diseases, or conditions, rather. The testimony was that when Peyton was brought to Arizona, those conditions went away. Your Honor, based upon the court's order of granting Mr. Marshall longer periods of time in which to see Peyton, and based upon the sharing of the expenses and things of that nature, it is clear that while Mr. Marshall may not have the identical visitation rights that were agreed upon with Jennifer, he is definitely, rather, the court has seen to it, and Jennifer will see to it, that Peyton and Mr. Marshall have a continuing good relationship. And it's our position to this court that the lower court actually did consider the factors and accuracy, and that's supported by the record. I'll just ask a quick question. Okay, so the court took the case under advisement? Yes. And then was a docket entry made? How was it that you were told to prepare the order? Was that an open court? Actually, it was not. It was not. I recollect that it was, I was appearing in front of Judge Kelly on a different matter who pulled me aside and said, he had handed me a handwritten piece of paper which says, write up an order consistent with this. I had it typed up and he signed it. Okay. Do you have rebuttals? Yes. I'm just curious, did you get any notice of what the decision was before you got the order? I did not. So how were you advised of the order? Did you just receive the signed judgment? Yes. And did you understand it to be a proposed judgment that was prepared by opposing counsel? At the time, no. I did not learn that until after. Just to touch on a few things that Attorney Brandmeier has stated, he is absolutely correct in saying that Paul was okay with her moving an hour and a half away if it was in Illinois, whatever surrounding area, if it was in Missouri. I think that further goes to show that his motives were pure in the sense that he just wanted to remain in close proximity with his daughter. To touch on Paul's statement that he was okay with Jennifer moving if her and Kelly were going to be engaged and they were to be married, his testimony also went on to state, when asked why he felt that way, was because he didn't think that he had a chance. He didn't think that he could oppose it. He was under the impression that if Jennifer was married and her husband had to move out of the state, there was no way that a court would say no. As to Jennifer facilitating a relationship between the two, that's just not, in fact, the case. Jennifer did not, well, you did mention that it was a two-way street. Jennifer did not notify him, did not notify Paul, her dentist, her doctors, parent-teacher conferences, all those types of things. And when asked why, she said it just never occurred to her. When asked if she would want to discuss big decisions with Paul, her response, I believe, was of course not. But conversely, it must have never occurred to him to ask. That's possible. I don't think that question was ever posed to him. In addition, as far as facilitating a relationship between the two, Jennifer controlled the visitation. There was no visitation order in place. And if she did not want him to see Peyton or if she wanted to go on vacation without any notice to him, she could. And she did that. New Year's Eve, Christmas of 2009 and New Year's Eve of 2009, Jennifer took Peyton to Arizona for, I believe, almost a month and a half. And during that time, there was no, she did not allow Peyton any phone contact with Paul. Paul tried to call. There was nothing. And then our, this was originally set for June of 2010. We had filed a motion to dismiss. That was heard that day. And Jennifer was given an additional, I believe it was 21 days, to amend her petition. And it was then set for July 9th, which is when we actually had the hearing. A few days after our hearing on the motion to dismiss, Jennifer unilaterally, without any notice to Paul, took Peyton to Arizona. Paul missed two weeks. Was that in violation of any court order? No. I mean, you could say that Paul is not on his rights because he never bothered to file any type of petition to have a visitation scheduled. That could be argued. And I believe Attorney Brandmeier actually posed that question to him in his cross-examination. And Paul advised or indicated that when he would discuss filing any sort of pleadings or petition with the court, when he discussed that with Jennifer, Jennifer asked him not to because it would affect the loans and the grants that she received from SWCC. So, as you said, her, Jennifer taking Peyton to Arizona for a month without any notice to Paul was absolutely not in violation of any court order. It just goes to show that she, it's difficult for her to foster a relationship between the two. When asked if you were to be successful in your petition for removal, do you plan on going to Arizona right away? And she said yes. So, knowing that she planned on moving to Arizona, if successful, she took Peyton the month before without any notice to Paul. Paul missed two agreed-upon weekends, visitation as well as Father's Day, and any phone contact between the two was initiated by Paul, not by Jennifer. And just briefly, Attorney Brandmeier did mention that while he had visitation with Peyton for his alternate weekends, he was working most of the time. He was working from about 10 p.m. to 7 a.m. during which Peyton was asleep, which I believe is also in a transcript of the proceedings. And that's all I have, unless there are any questions. Thank you both. Thank you. Sorry to hear it, Bruce. In arguments, I will take the matter under advisory.